**AFFIDAVIT**  1:21MJ2001

I, Paul Cruz, Special Agent of the Federal Bureau of Investigation, United States Department of Justice, being duly sworn on oath, hereby deposes and states as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), Cleveland Division. I have been so employed since 2010 and as such have been assigned to investigate organized criminal enterprises engaged in a variety of racketeering offenses to include drug trafficking, money laundering, document fraud, theft, drug violations, and other criminal offenses which have occurred in, and outside, the Northern District of Ohio. I have training and experience in interviewing and interrogation techniques, arrests, search and seizure, search warrant applications, and various other procedures. In the course of conducting investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, consensual monitoring and recording of both telephonic and non-telephonic communications, and executing search warrants. As such, I am an law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is , and officer of the United States empowered by law to conduct investigation of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. Prior to joining the FBI, I was employed for seven years as a United States Marine Corps officer. In that capacity I was assigned to work investigations involving fraudulent enlistments, fraud against the government, adultery, vehicle accidents, Congressional inquiries, litigation claims, and other crimes under the Uniform Code of Military Justice.

2. The statements contained in this affidavit are based on my personal observations as well as information developed by other Special Agents ("SA") of the FBI, Ohio Bureau of

1

Criminal Investigations ("BCI"), and officers and detectives of state, local, and federal police departments in Ohio who aided in the investigation. Unless otherwise noted, whenever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or an investigator (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Likewise, any information pertaining to vehicles and registrations, personal data on subjects, and record checks, has been obtained through the Law Enforcement Automated Data System ("LEADS"), various state driver's license motor vehicle records, online database searches or the National Crime Information Center ("NCIC") computers, and various open source databases such as LexisNexis.

3. Your Affiant has participated in and conducted investigations into activities involving narcotics and other illicit, not-narcotic controlled substances. Your Affiant is familiar with the methods with which drug traffickers conduct their businesses, including, but not limited to, their methods of importing, and distributing controlled substances, their use of cellular telephones, computers and other electronic devices, their use of businesses, houses, multiple vehicles and other facilities in which controlled substances are stored and meetings are conducted, and their use of numeric codes and code words to conduct their narcotics transactions. Affiant is also familiar with drug traffickers' use of communication devices, and texting applications and programs on such devices to conduct their businesses, including, but not limited to, transmitting information regarding price, quantity, and transportation of controlled substances.

4. Your Affiant is aware persons involved in criminal activity, particularly in the distribution of controlled substances, frequently attempt to conceal their identities, the locations

at which the illicit transactions occur, and the laundering of proceeds from the illicit activity to "plain" currency.

5. Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that violations of 21 U.S.C. § 846 (Conspiracy), 21 U.S.C §§ 841 (distribution of controlled substances), and 18 U.S.C. §§ 922(g) (felon in possession of a firearm) (hereinafter referred to as the "Target Offenses") have been committed, are being committed, and will continue to be committed ERNEST CORRIGAN, ANDREW HOUSEHOLDER, and other not yet identified.

## CONFIDENTIAL HUMAN SOURCE

6. During the course of this investigation, law enforcement agents and officers have received information from a Confidential Human Source (CHS) regarding members of the Drug Trafficking Organization (DTO). Some of the information from this CHS has been outlined in this affidavit. Information provided by the CHS has been corroborated to the extent practicable through investigative techniques including, but not limited to, physical surveillance, review of telephone toll records and pen register data, recorded telephone calls, conversations with other law enforcement officers, review of investigative reports and debriefings of other CHSs. The CHS listed in this affidavit has provided information pertaining to the drug trafficking activities of the members of the DTO including CORRIGAN and HOUSEHOLDER.

7. CHS has provided information to the FBI, Ohio Bureau of Criminal Investigations, and the Geauga County Sheriffs since June 2020. CHS is providing information in the hopes of getting consideration at sentencing for pending drug charges for possession and distribution of controlled substances. CHS has no criminal and the information provided by CHS has proved reliable through independent verification. Your Affiant does not have any reason to

believe the information provided by CHS was false, therefor, your Affiant believes that CHS is reliable.

## PROBABLE CAUSE

8. In June 2020 members of the Cleveland Federal Bureau of Investigation (FBI), Ohio Bureau of Criminal Investigations, and the Geauga County Sheriffs identified ERNEST CORRIGAN and ANDREW HOUSEHOLDER as traffickers of methamphetamines in Ohio, including the Northern District of Ohio. CORRIGAN has several previous federal convictions for trafficking in methamphetamines.

9. On or about August 4, 2020, a physical surveillance was conducted on CORRIGAN. During the surveillance, CORRIGAN was seen placing a book bag in a white, 2008, GMC 2500, temporary license plate K405193, Vehicle Identification Number (VIN) 1GTHK23608F171395, registered to ERNEST CORRIGAN ("TARGET VEHICLE") before exiting 8569 Euclid Chardon Road, Kirtland, Ohio 44094 ("Target Location 1"); the residence of HOUSEHOLDER and CORRIGAN. TARGET VEHICLE then met with another vehicle on a rural road and parked side by side. An unknown male exchanged a small item with CORRIGAN, believed to be money, in exchange for a blue bag, presumed to be methamphetamine. In my experience, the exchange on the road is indicative of drug trafficking, also known as a "hand to hand" drug transaction, in which the seller meets his clients on a roadway that is away from high trafficked areas in order to avoid law enforcement detection. Additionally, TARGET VEHICLE drove directly to the exchange location and directly back to Target Location 1 after the drug transaction was completed.

10. On or about September 22, 2020, at the direction of law enforcement, a Confidential Human Source (CHS) conducted a consensually monitored controlled purchase of

methamphetamine from ANDREW HOUSEHOLDER at 8569 Euclid Chardon Road, Kirkland, Ohio (Target Location 1) . Physical surveillance was also established during the transaction. Both HOUSEHOLDER and CORRIGAN reside at the residence. Prior to the meeting, CHS arranged via text message and phone calls to get a sample of methamphetamine from HOUSEHOLDER. When CHS arrived at the Target Location 1, the CHS entered Target Location 1 and met with HOUSEHOLDER inside Target Location 1. While inside Target Location 1, HOUSEHOLDER gave CHS approximately .25 grams of methamphetamines as a sample. CHS and HOUSEHOLDER then discussed that CORRIGAN is HOUSEHOLDER's roommate. HOUSEHOLDER stated to CHS could purchase approximately one ounce of methamphetamine a week depending on how much CORRIGAN had available for sale. HOUSEHOLDER stated that he would introduce CHS to CORRIGAN in the future for larger purchases of methamphetamine.

11. After the transaction was completed, the sample of methamphetamine was taken into possession by law enforcement and field tested positive for methamphetamine and placed into evidence. Later, laboratory analysis of the seized suspected methamphetamine confirmed the presence of methamphetamine.

12. On or about October 9, 2020, at the direction of law enforcement, CHS conducted a consensually monitored controlled purchase of methamphetamine from HOUSEHOLDER. Physical surveillance was also established during the transaction. Prior to the meeting, CHS arranged via text message and phone call to purchase a half ounce of methamphetamine from HOUSEHOLDER. In the text messages exchanged between HOUSEHOLDER and CHS, HOUSEHOLDER states "got a half (ounce) only. That's all he (CORRIGAN) could get right now". Additionally, HOUSEHOLDER stated via text "I can get more if you want. It went down

too $1050 (per ounce) Should be able to get whatever. I'll let u know when it's good just be ready. Imk what I want and I'll save it of u". HOUSEHOLDER then directed CHS to meet at a Circle K in Kirkland, Ohio. When CHS arrived at Circle K, CHS got into HOUSEHOLDER's vehicle and drove to the drive way of Target Location 1 where CHS exchanged $600 for a half ounce of methamphetamine. HOUSEHOLDER and CHS discussed larger purchases of methamphetamine in the near future. HOUSEHOLDER then returned CHS to the Circle K where they parted ways. HOUSEHOLDER then traveled back to Target Location 1 with the money from the exchange. Law enforcement observed HOUSEHOLDER's vehicle in the driveway of Target Location 1.

13. After the transaction was completed, the half-ounce of methamphetamine was taken into possession by law enforcement and field tested positive for methamphetamine and placed into evidence. Later, laboratory analysis of the seized suspected methamphetamine confirmed the presence of methamphetamine.

14. On or about October 23, 2020, at the direction of law enforcement, CHS conducted a consensually monitored controlled purchase of methamphetamine from HOUSEHOLDER. Physical surveillance was also established during the transaction. Prior to the meeting, CHS arranged via text message and phone call to purchase two ounces of methamphetamine from HOUSEHOLDER. HOUSEHOLDER stated via text message that "when he (CORRIGAN) gets off work he's (CORRIGAN) going to get it. Bing (been) waiting for some that hasn't shown up yet. Now he (CORRIGAN) doesn't have the cash for what he (CORRIGAN) wanted so r u willing to give me the money for him (CORRIGAN) to grab it while he's (CORRIGAN) there. I can cover it but price goes up". HOUSEHOLDER directed CHS to meet at Target Location 1. When CHS arrived at the Target Location 1, the CHS entered

Target Location 1 and met with HOUSEHOLDER inside Target Location 1. While inside Target Location 1, the CHS exchanged $2,300 for two ounces of methamphetamine from HOUSEHOLDER. HOUSEHOLDER explained to CHS that CORRIGAN was getting the methamphetamine from CORRIGAN's old supplier and that CORRIGAN could get greater amounts in the future. HOUSEHOLDER further explained that CORRIGAN recently travelled several hours to retrieve the methamphetamine for the controlled purchase that HOUSEHOLDER "set aside" for CHS.

15. After the transaction was completed, the 2 ounces of methamphetamine was taken into possession by law enforcement and field tested positive for methamphetamine and placed into evidence. Later, laboratory analysis of the seized suspected methamphetamine confirmed the presence of methamphetamine.

16. On or about October 27, 28, and 29, 2020, TARGET VEHICLE operated by CORRIGAN has been observed at Target Location 1.

17. On or about November 4, 2020, a warrant, issued in the Northern District of Ohio, was issued for a GPS tracking device to be attached to TARGET VEHICLE. The device was attached on November 16, 2020.

18. On or about November 23, 2020, HOUSEHODLER texted CHS "You want 2. I'll set whatever you want aside". HOUSEHOLDER was asking CHS if he wanted two ounces or methamphetamine. It is believed that HOUSEHOLDER is stating "set whatever you want aside" is from a larger quantity of methamphetamine that CORRIGAN gets.

19. On or about November 28, 2020, CHS texted HOUSEHOLDER that CHS would like "3 or 4 (ounces of methamphetamine) if that's possible". HOUSEHOLDER replied "I'll find here shortly" and then "When do u want them, Do you want 3 or 4 I need to know". CHS and

HOUSEHOLDER were discussing CHS purchasing three or four ounces of methamphetamine from HOUSEHOLDER. It is believed that HOUSEHOLDER is waiting to find out how much methamphetamine he can get from CORRIGAN.

20. On or about December 1, 2020, HOUSEHOLDER texted CHS, "Thursday is going to work the best for me does that work for you?" CHS replied on December 2, 2020, "Yeah sorry I just work up Thursday works best for me too". HOUSEHOLDER replied "Cool[.]" Here, HOUSEHOLDER and CHS are discussing arranging a potential transaction for methamphetamine on Thursday.

21. On or about December 3, 2020, HOUSEHOLDER texted CHS "I can't do that thill this weekend he (CORRIGAN) went out of town for work. So I'll catch up with you when he (CORRIGAN) gets back." The GPS on TARGET VEHICLE confirmed that CORRIGAN travelled to the Dayton, Ohio, area during this time. It is believed, based on the message from HOUSEHOLDER, that CORRIGAN did not resupply his methamphetamine and therefore it was unavailable for CHS to purchase.

22. On or about December 5, 2020, HOUSEHOLDER texted CHS, "He (CORRIGAN) got back late last night and working on that now. Sorry I was told it was good when ou said what I wanted but it's in the works". CHS replied "Ok just let me know, I got work tomorrow again at 6. I can try to make it work any day before 6 though". The GPS on TARGET VEHICLE confirms that CORRIGAN returned from Dayton, Ohio, during this time. It is believed that HOUSEHOLDER is waiting on CORRIGAN to get an order of methamphetamine to sell to CHS.

23. On or about December 10, 2020, CHS texted HOUSEHOLDER "Hey you got any idea what day we may be good to go this week? Just want to know if I should be planning on

8

seeing you before work". HOUSEHOLDER replied "Sorry man I don't know I just asked him (CORRIGAN) again. He's out for work until this weekend and I just asked him (CORRIGAN) he starting being a dick about it and he (CORRIGAN) said I'll try to do it when he (CORRIGAN) gets back but that's what he said last week too so I don't known I just had to let you known as soon as I know for a fact. I don't want to keep telling you it's going to happen and not happen but he's just been working a lot". GPS confirmed that TARGET VEHICLE was in Dayton, Ohio, during this time frame. It is believed that CORRIGAN has been traveling to Dayton, Ohio, to do legitimate work in December 2020. According to HOUSEHOLDER, when CORRIGAN returns to Target Location 1, and has the time to acquire the amounts of methamphetamine CHS has requested, CORRIGAN will travel to his unknown supplier. It is believed that CORRIGAN will use TARGET VEHICLE to travel to his unknown supplier after when he is done traveling for work.

    24. On or about December 19, 2020, HOUSEHOLDER texted CHS, "It'll be when he (CORRIGAN) gets back and then he (CORRIGAN) doesn't do it and now he's gone till Friday night. I'll get on him about it but won't be till the weekend. Sorry man." CHS replied "Sorry I been working all night. I was just gonna say if it's 4 (ounces of methamphetamine) causing the problem I'm okay with less. I'd rather get something going then nothing at all. Let me know on the weekend how it goes." HOUSEHOLDER replied "I will. He's (CORRIGAN) waiting to hear from the guy back from him to see who's going to meet where and to figure everything out so just letting you know I'll let you know as soon as it happens." CHS replied "Ok sounds good thank you." HOUSEHOLDER replied "He (CORRIGAN) said he doesn't have all the cash to do what you want so if you don't want to five him (CORRIGAN) ur cash I can try and cover it but it goes up like last time. Lmk what you want to do." CHS replied "Sorry I just woke up, I had

overtime last night. Yeah, just go ahead and cover it this time if that's okay with you." HOUSEHOLDER replied "Okay I see how much I can come up with seeing how it's Sunday and I can't get into the bank and only take so much out of the ATM but we'll see what's up. I'll let you know." CHS replied "Yeah that's fine. If you end up not getting enough just let me know and I can figure it out." HOUSEHOLDER replied "I only have enough for 3 (ounces of methamphetamine)." It is believed that HOUSEHOLDER is spotting CHS the money for CORRIGAN to purchase three ounces of methamphetamine from an unknown supplier.

25. On or about December 21, 2020, HOUSEHOLDER texted CHS "I'll do what I have to to make it happen before Christmas." It is believed that HOUSEHOLDER is trying to conduct the drug transaction before December 25, 2020.

26. On or about December 23, 2020, the TARGET VEHICLE left the Dayton, Ohio, area, and headed toward Target Location 1. Near Medina, Ohio, TARGET VEHICLE was pulled over for a traffic infraction by the Ohio State Highway Patrol. A K9 unit was dispatched to the location of TARGET VEHICLE with CORRIGAN being the driver and sole occupant. The K9 alerted of the presence of narcotics and the TARGET VEHICLE was searched. However, no narcotics were found in the vehicle. However, $3,000 in cash was discovered in the front seat of the TARGET VEHICLE.

27. After the vehicle stop, HOUSEHOLDER texted CHS stating "He's (CORRIGAN) back now but got pulled over 20 mins from his dude's house so is going to do it tomorrow. These fucking people and this curfew is bullshit. I'm glad he's ok but I almost lost a good chunk of cash if it would of went different for him and the cops. I'm hoping it'll be early in the day but we'll see what it schedule look like for tomorrow. Are you working?" It is believed that HOUSEHOLDER gave CORRIGAN $3,000 for the purchase of the methamphetamine. It is

also believed that CORRIGAN was traffic stopped by the Ohio State Highway Patrol before CORRIGAN could meet his supplier.

28. On or about December 28, 2020, the TARGET VEHICLE left Target Location 1 and proceeded to several locations in Beachwood, Ohio, and then returned to Target Location 1.

29. On or about December 29, 2020, HOUSEHOLDER texted CHS "He (CORRIGAN) has it (methamphetamine) already. He wasn't here when I got home (Target Location 1) so hopefully he taking care of it now. I'll let you know." HOUSEHOLDER followed up with "It's good he (CORRIGAN) just got back. I have my daughter so after she goes to her mon's we can meet up. U got 4 (ounces of methamphetamine) for 1150 each. I have those in hand so everything is good."

30. On December 30, 2020, a search warrant was issued in the Northern District of Ohio for Target Location 1. On December 31, 2020, the search warrant was executed. During the execution of the search warrant the following items were recovered including a methamphetamine lab in the upstairs of the residence. All weights are approximations:

    a. 1,238 grams of methamphetamines

    b. 1,608 grams of marijuana

    c. 1,974 grams of edible marijuana

    d. 13.4 grams of Psilocybe cubensis mushrooms

    e. 1 gram of powdered cocaine

    f. 1 gram of heroin

    g. 32.2 grams of Oxycodone tablets

    h. 173.9 grams of Oxycodone liquid

    i. Approximately in cash $4,000

    j. Multiple scales

    k. Cutting agents

    l. 16 firearms including AR-15 style rifles, sniper rifles, shotguns, and handguns

    m. Thousands of rounds of ammunitions of all calibers

  31. HOUSEHOLDER was interviewed during the execution of the search warrant but denied any involvement, however, approximately four (4) ounces of methamphetamine and a handgun firearm were recovered from the safe in HOUSEHOLDER's bedroom.

  32. CORRIGAN was interviewed during the execution of the search warrant and stated that he knew he was in trouble and was wresting with the idea of cooperating with law enforcement. CORRIGAN did deny operating the methamphetamine lab discovering in the upstairs of the residence and stated that the lab was used to make Adderall pills. However, the pills were field tested positive for methamphetamines. It is believed that CORRIGAN was using the lab to create methamphetamine pills disguised as Adderall. USPS packages were discovered next to the methamphetamine lab addressed to CORRIGAN. Additionally, scales, methamphetamine pills, a coffee grinder with methamphetamine pills inside, a AR-15 rifle, and a shotgun was recovered from CORRIGAN's bedroom.

## CONCLUSION

  33. Based upon my training and experience, including my participation in this investigation, I believe that probable cause exists that ERNEST CORRIGAN and ANDREW HOUSEHOLDER are continuing criminal conspiracy involving narcotics trafficking and firearms in violation of Title 21 U.S.C. § 846 (Conspiracy), Title 21 U.S.C. § 841 (Drug Trafficking), and Title 18 U.S.C. § 922(g)(felon in possession of firearms). Therefore, it is hereby

respectfully requested that the Court issue an arrest warrants CORRIGAN and HOUSEHOLDER in order to disrupt the DTO.

_____
Paul R. Cruz, Special Agent
Federal Bureau of Investigation

Sworn to via telephone after submission by reliable electronic means on this 4th day of January, 2021. F.R.C.P. 4.1.

_____    Time: __1:48 PM__
DAVID A. RUIZ
United States Magistrate Judge
Northern District of Ohio

13